## In re Anonymous No. 46 D.B. 73

Disciplinary Board Docket no. 46 D.B. 73.

To the Honorable Chief Justice and Justices
of the Supreme Court of Pennsylvania:

HAMMERMAN, *Board Member,* September 24,
1979—Pursuant to Pa.R.D.E. 218(c)(5) (Rules),
the Disciplinary Board of the Supreme Court of
Pennsylvania (board) herewith submits its findings
and recommendations with your honorable court
with respect to the above petition for reinstate-
ment.

### 1. HISTORY OF PROCEEDINGS

On September 19, 1978 a petition for reinstate-
ment was filed by petitioner. Said petition recited,
inter alia, that on October 14, 1977 pursuant to the
provisions of Pa.R.D.E. 301(a) your honorable
court issued an order at no. 161, Disciplinary Doc-
ket No. 1 (Board File No.) that the name of peti-
tioner be placed on the inactive roll of attorneys,
due to the order of the Court of Common Pleas of
[  ] County involuntarily committing petitioner to
[  ] State Hospital under section 304 of the Mental
Health Procedures Act of July 9, 1976, P.L. 817, 50
P.S. § 7304.

Thereafter, pursuant to the provisions of Pa.R.D.E. 218(2) the board on September 19, 1978 referred the petition to a hearing committee.

Following appropriate notice, a hearing was held before the hearing committee on Monday, December 18, 1978. On July 5, 1979, the hearing committee filed its report and recommendation with the Secretary of the Board recommending that petitioner be reinstated. The Secretary served copies upon counsel for petitioner and Assistant Disciplinary Counsel on July 5, 1979, together with notice of their right to file exceptions. No exceptions to the report of the hearing committee have been filed by either petitioner or respondent within the prescribed times.

## 2. DISCUSSION

As indicated in the report and recommendation of the hearing committee, petitioner presented the testimony of Doctor "A", the treating physician, and Doctor "B", both at [   ] State Hospital. The doctors testified that petitioner's mental disease was diagnosed as Paranoid-Schizophrenia and that his prognosis of remaining stable was dependent on his required medication.

Since petitioner's discharge from the Hospital in April, 1978, he has been receiving his medication and periodical out-patient treatment through the [   ] Mental Health Center of [   ] Hospital. The doctors believe that when the symptoms of petitioner's disease are not in remission, he is not capable of handling his own affairs or the affairs of others and, therefore, not capable of practicing law. While the professional opinions of Doctors "A" and "B" agree that petitioner is currently mentally able to resume the practice of law, it must be brought to the court's attention that petitioner's illness has caused him to

be hospitalized approximately seven times in the past 17 years. The report also recognizes that should petitioner discontinue his daily medication, there is a 90 percent chance that he will again become psychotic.

It must be noted that petitioner has developed a pattern of failing to take his medication at some point in time after being released from the various institutions. The court's attention is directed to the fact that petitioner had been suspended and reinstated prior to the instant suspension.

A reading of the notes of testimony of petitioner is particularly disturbing. When queried: "How do you perceive what problem, if any, you have?"

A. Well, the only thing I can tell you is that the problem seems to have resulted when I have had marital difficulties and this time with the wife I am divorcing. It has resulted, this time, in the loss of employment, at least it was a factor in it.

Before I went into the [ ] State Hospital, I also had an abdominal problem. I had a ruptured colon. That, plus the separation, plus losing my job and the physical problem sort of resulted in the roof caving in. I don't know how you would describe that medically though.

Q. Well, I am not really asking you for a medical definition, but how you perceive what it is that you have. Apparently, isn't it true that for the past 17 years, you have had sporadic difficulties with your mental health and have been committed a number of times? Is that true?

A. Well, I haven't been committed a number of times. Each time the wife was a factor. I was committed to [ ] Hospital in 1973; the separation with the wife, again, here in [ ] County, but there was no proceeding taken on account of that. I was in there for a month. Again, the wife had signed a

petition on that. I was in there for a month. This time, probably through concern over the children and my wife, the thing happened again. But I wouldn't say a number of times.

Q. Were you ever in the [ ] State Hospital in [ ]?

A. Yes.

Q. When was that, approximately?

A. I don't—

Q. 1971.

A. It was back further than that. That was before I passed the bar examination.

Q. Was that a commitment, or did you voluntarily seek help?

A. It wasn't a court commitment, no.

Q. Did that have to do with a mental problem?

A. I suppose so. I think, as I recall, I had a problem because I was unable to find employment.

Q. Were you ever in the [ ] Hospital in [ ]?

A. Yes.

Q. Can you tell us when that was, approximately?

A. I would say it was probably around 1968. I am not certain.

Q. That again, had to do with a mental difficulty you were having?

A. Well, I suppose so. I believe the wife signed me in at that time.

Q. Referring to the 1973 commitment to the [ ] Hospital—what I would like to do is get those dates on the record—wasn't it true that you were involuntarily committed on June 11, 1973?

A. It is true.

Q. That was a 60-day commitment; do you recall?

A. I believe so.

It therefore, appears that petitioner is not aware of his mental condition but places his illness on

other factors such as, divorce proceedings with his wife (his third), and his inability to find employment. He also appears uncertain about the medication he is receiving. The court's attention is directed to the following exchange:

Q. At that time you were discharged from the [  ] Hospital, were you on any medication?

A. I don't recall. I know that they were giving me medicine at the Hospital. I also know that they changed that around quite a bit. In other words, the medicine that I was taking was not the same at all times. I am not sure just exactly what—

Q. I am not going to ask you what type of medication you were on. Were you supposed to take some sort of medication for your mental illness?

A. Was I supposed to take medication after I was released from the hospital?

A. Yes. I don't know. I suppose so. I don't know for sure that I can say that I remember them insisting that I take neducube after I left the hospital.

Q. Up until at least the time you were reinstated to active practice, however, you were going to an outpatient clinic for psychiatric counseling; isn't that true?

A. I think that I went once or twice. That was all. They were trying out a new drug, and they wanted me to participate. I didn't continue that. I didn't have to, and I didn't continue with that.

Q. When you say, "I didn't have to," what do you mean you didn't have to? You didn't have to participate in the program or you didn't have to take medication?

A. I didn't have to participate in the program.

Q. Was it recommended that you continue on some medication to keep your symptoms in remission?

A. To tell you the truth, I really don't think so. I really don't think so.

And under further questioning the court's attention is directed to the following:

Q. When you were discharged from the [   ] Hospital back in September, 1974, were you told to take medication on a daily basis?

A. Yes, I was taking medication.

Q. How long did you continue with that medication?

A. Until the doctor and I decided that it wasn't necessary for me to take it any longer.

Q. Could you give us an estimate of when that may have been?

A. Six months to a year, I think. I would say about a year.

It has been this writer's experience with clients who have been diagnosed as psychotic, that those who recognize their illness and fully understand that unless they remain on medication, that they will be returned to the hospital, have more successful remissions. I therefore, have a great deal of reservation about the ability of this petitioner to function in a law practice without supervision.

On the basis of the record, we agree that petitioner has demonstrated his competency and learning in the law. However, it is the opinion of the board that the guidelines set forth in the report of the hearing committee are insufficient to monitor the work of petitioner. In view of his inability to recognize the importance of strict adherence to the medication program it is the board's belief that petitioner's treating physician shall make frequent reports.

Since petitioner has held nine different jobs in nine years, it is felt that he should not be reinstated

at this time. It should be noted that in Rohl v. Texas, p. 29, 1978\*, the attorney was limited to areas of less stressful matters by agreement. It would seem wiser in view of our responsibility to the public that petitioner reapply in a year's time and that he be ordered to undergo examination by an independent impartial medical expert.

### 3. RECOMMENDATION

The Disciplinary Board respectfully recommends to your honorable court that the petition for reinstatement of petitioner be denied.

P.L. Schiavo, Esq., did not participate in the adjudication.

### ORDER

EAGEN, C.J., And now, October 15, 1979, the recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania dated September 24, 1979, is accepted and approved; and it is ordered, that the petition for reinstatement is denied.

---

\*Bar Leader, July—August 1979, p. 18, Mental Disability and the Right to Practice Law, Daniel L. Skoler.